UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:15 CR 107 SNLJ (ACL) ) |
| TRAE CHARLES BELL, | ) ) |
| Defendant. | ) |

## **REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

## **I. Background**

Trae Charles Bell is charged with being a felon in possession of a firearm. (Doc. 2.) He filed a Motion to Suppress Evidence and Statements (Doc. 19) and claims that officers seized a firearm and other evidence from his home on June 3, 2015 without a warrant or consent. Additionally, he claims that all statements he made to law enforcement officers were the product of the unlawful warrantless seizure of his home, or in violation of the Fifth Amendment. The Government filed a response in opposition to the Defendant's claims. (Doc. 22.)

An evidentiary hearing was held on December 3, 2015. A Children's Division Investigator, Erica Long; as well as two officers from the Cape Girardeau County Sheriff's Department (Cpl. Heather VanGennip and Deputy Josh Wiseman) testified on behalf of the Government. The Defendant's fiancée and the mother of his one-year old

child, Chelsey Green, testified on behalf of the Defendant. Following the hearing, both parties submitted memoranda. (Docs. 27, 28.)

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motion to Suppress Evidence be denied.

## II. Proposed Findings of Fact

On June 3, 2015, at approximately 6:03 p.m., a hotline report concerning the Defendant's use of firearms, suspected drug abuse, and erratic behavior was made to the Missouri Department of Social Services, Children's Division. The hotline reporter expressed a concern for the Defendant's one-year-old child. The hotline reporter believed that the Defendant was abusing drugs and intimidating people with guns, and claimed that the Defendant fired a gun in the home a little over one month earlier and that he had shot at someone in the yard the day before the call. The reporter stated that the Defendant's youngest child was in the home when the gun was discharged. The reporter further indicated that he/she had known the Defendant "for years" and had seen the Defendant "obviously high with loaded guns in the vehicle and with the baby." The reporter added that the Defendant was a felon and prohibited from possessing firearms.

Erica Long, an investigator[1] for the Children's Division was assigned to investigate the hotline report. Based on the nature of the allegations and the potential for

---

[1] While Ms. Long's employment is as an investigator she is not a certified peace officer in the state of Missouri.

criminal charges, Ms. Long drove to the Cape Girardeau County Sheriff's Department to request law enforcement assistance. She arrived at the Sheriff's Department at approximately 6:43 p.m. Coincidentally, approximately ten minutes later, there was a report of a vehicle fire in the same neighborhood as the Defendant's residence. The fire incident took priority over the hotline report. When the fire was contained, Deputy Josh Wiseman, Cpl. Heather VanGennip, and one other officer assisted Ms. Long in approaching the Defendant's residence.

The Defendant's fiancée, Chelsey Green, answered the door. Ms. Green invited Ms. Long and the officers into the home. Ms. Green was described as extremely cooperative, friendly, and polite. The Defendant's and Green's one-year-old child was also present along with two adults and at least two other children. According to Ms. Long, the adults and other children left the residence after the arrival of Ms. Long and the officers. Ms. Long told Ms. Green that she and the officers had come to the residence in response to a hotline report that her child may be in danger due to the presence of firearms and drug use. Ms. Green denied there were any guns present, but indicated that if there were guns they would be found in the north end of the trailer. Ms. Green also denied that the Defendant was using drugs.

Ms. Long asked if it was okay to do a walk-through of the residence to confirm whether it was safe for the child. Ms. Green was very cooperative and took Ms. Long and Deputy Wiseman to the master bedroom. The room had a mattress and box springs on the floor plus a child's bed in the corner next to the larger bed. Ms. Green indicated the one-year-old child slept on the smaller bed.

Deputy Wiseman followed the women into the bedroom. He and Ms. Long immediately noticed a shotgun was propped up against the wall by the bedroom closet. Deputy Wiseman secured the shotgun and found it was loaded. He also saw a black bag on the bed. Deputy Wiseman asked Ms. Green about the bag and she replied she had never seen it before. Deputy Wiseman asked if he could look in it and Ms. Green replied "sure, go ahead." The bag contained scales and a white residue that tested positive for methamphetamine. Ms. Green said she had no idea how the bag had gotten there and she'd never seen it before.

Ms. Long gave Children's Division paperwork to Ms. Green which described the investigation process, procedural rights, and so forth. Although Ms. Green denied using drugs, Ms. Long asked if she would be willing to submit a urine sample. Ms. Green agreed and an officer was called to the scene to take the sample. While waiting for the officer to arrive, Ms. Long noticed there was a bullet hole in the kitchen floor. Ms. Green claimed the bullet hole had been there when she and the Defendant moved into the trailer. As a result of the investigation conducted by Ms. Long, the one-year-old child was placed in temporary protective custody pending the results of Ms. Green's drug test.

During the contact with Ms. Green, Cpl. VanGennip contacted the Defendant by phone. The Defendant reportedly told Cpl. VanGennip he would return to the residence within a half an hour to speak with the officers. The Defendant never showed up.

Later, on June 6 and June 10, 2015, the Defendant made statements to representatives of Children's Services. On each of those dates, he made admissions regarding his use of drugs and his possession of the shotgun. During the suppression

Deputy Wiseman followed the women into the bedroom. He and Ms. Long immediately noticed a shotgun was propped up against the wall by the bedroom closet. Deputy Wiseman secured the shotgun and found it was loaded. He also saw a black bag on the bed. Deputy Wiseman asked Ms. Green about the bag and she replied she had never seen it before. Deputy Wiseman asked if he could look in it and Ms. Green replied "sure, go ahead." The bag contained scales and a white residue that tested positive for methamphetamine. Ms. Green said she had no idea how the bag had gotten there and she'd never seen it before.

Ms. Long gave Children's Division paperwork to Ms. Green which described the investigation process, procedural rights, and so forth. Although Ms. Green denied using drugs, Ms. Long asked if she would be willing to submit a urine sample. Ms. Green agreed and an officer was called to the scene to take the sample. While waiting for the officer to arrive, Ms. Long noticed there was a bullet hole in the kitchen floor. Ms. Green claimed the bullet hole had been there when she and the Defendant moved into the trailer. As a result of the investigation conducted by Ms. Long, the one-year-old child was placed in temporary protective custody pending the results of Ms. Green's drug test.

During the contact with Ms. Green, Cpl. VanGennip contacted the Defendant by phone. The Defendant reportedly told Cpl. VanGennip he would return to the residence within a half an hour to speak with the officers. The Defendant never showed up.

Later, on June 6 and June 10, 2015, the Defendant made statements to representatives of Children's Services. On each of those dates, he made admissions regarding his use of drugs and his possession of the shotgun. During the suppression

hearing, defense counsel indicated that the statements he wished to suppress were only the statements the Defendant made to Deputy Wiseman on a later date.

On June 12, 2015, the Defendant made contact with Deputy Wiseman by having a friend contact the Sheriff's Department. Deputy Wiseman went to the location provided by the friend; he was in a marked patrol car. The Defendant emerged from one of the trailers. Deputy Wiseman then spoke with the Defendant about the June 3, 2015 investigation. The conversation took place in the driveway. Deputy Wiseman did not detain the Defendant or handcuff him, nor did he advise the Defendant of the *Miranda* warning. The Defendant made statements regarding the shotgun and drug related items that had been found at his residence. Deputy Wiseman asked the Defendant if he would be willing to complete a written statement. The Defendant said he was willing to do so and then completed a written statement. He also signed a consent form authorizing the search of his car. Although an odor of marijuana was detected in the vehicle, no evidence was located. Deputy Wiseman then arrested the Defendant for being a previously convicted felon in possession of the firearm that was found on June 3, 2015.

Ms. Green testified on behalf of the Defendant and had a bias in favor of him as she is his fiancée and the mother of his one-year-old child. Her testimony differed from the Government witnesses in some respects. Ms. Green claimed that Deputy Wiseman followed her into the home and the master bedroom prior to the arrival of Ms. Long and Cpl. VanGennip. Ms. Green also claimed that during Deputy Wiseman's initial entry into the home there were adults and children inside the residence because of the fire. She claims those people advised her that they were ordered to leave and she was left alone

with Deputy Wiseman. She testified that when Ms. Long arrived, the other officers let Ms. Long into the trailer and Ms. Green was in the kitchen. Ms. Green also testified that she told Ms. Long that it would be okay for her to walk through the residence, but couldn't remember whether she told Deputy Wiseman he could look in the black bag that was found on the bed.

In order to believe Ms. Green's testimony that Deputy Wiseman followed her into the master bedroom where a loaded firearm was in plain view prior to the arrival of Ms. Long and the other officers, there would have to be a finding that Deputy Wiseman did not see the firearm and did nothing to secure it. This is not believable in light of the fact that the whereabouts of the Defendant, a convicted felon, were unknown and that the discovery of the firearm constituted evidence of a crime.

In reviewing the Sheriff's Department records and those of the Children's Division, there were some discrepancies as to the timing of the initiation of the contact with Ms. Green. That being said, the testimony of Ms. Long, Cpl. VanGennip, and Deputy Wiseman was consistent in that each of the officers indicated they entered the residence at the same time. It was also clear that Ms. Long was conducting an investigation on behalf of the Children's Division, which was the only reason law enforcement were initially involved with contacting Ms. Green at the residence. The role of the officers was to provide assistance to Ms. Long. Additionally, Ms. Long testified that there were two men and at least two children present when she and the officers entered the residence, but that those people left after she and the other officers arrived. This also contradicts Ms. Green's testimony that Deputy Wiseman directed them to leave

prior to the arrival of Ms. Long and the other officers. Once the loaded firearm was found in the residence, Deputy Wiseman became more involved in the collection of evidence and documentation of the scene. The undersigned credits the testimony of Ms. Long and the officers regarding the sequence of events and finds that there was no law enforcement entry into the residence until Ms. Long arrived.

### III. Conclusions of Law

The Defendant urges this Court to find that law enforcement officers unlawfully seized a firearm and other evidence from his residence on June 3, 2015 after Ms. Green allowed the officers into the residence. The fruits of the resulting searches, however, need not be suppressed as long as Ms. Green voluntarily consented to the searches. *See, e.g., United States v. Miller*, 20 F.3d 926, 930 (8th Cir. 1994).

### III.A. Officers received consent to search the residence.

"The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." *United States v. Williams*, 521 F.3d 902, 905 (8th Cir. 2008) citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). A voluntary consent to be searched is an exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker," *Bustamonte*, 412 U.S. at 225, rather than "the product of duress or coercion, express or implied." *Id*. at 227.

"Whether an individual's consent is voluntary is a question of fact that must be determined from the totality of the circumstances." *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001) (quoting *Bustamonte*, 412 U.S. at 227). It is the government's

"burden to prove by a preponderance of the evidence that consent to search was freely given, but awareness of the right to refuse is not necessary for consent to be voluntary." *Bustamonte*, 412 U.S. at 227. "The precise question is not whether [a person] consented subjectively, but whether [their] conduct would have caused a reasonable person to believe that [they] had consented." *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001). *See also United States v. Gleason*, 25 F.3d 605, 607 (8th Cir. 1994) (defendant consented to search for weapons and cheerfully assisted in search that discovered other evidence of robbery; officer could infer consent to general search from assistance and demeanor); *United States v. Hampton*, 260 F.3d 832, 835 (8th Cir. 2001) (consent found where individual opened the door and allowed police to enter). In determining whether the government has met that burden, courts look to both the characteristics of the person consenting and the details of the environment in which the consent was given. *Bustamonte*, 412 U.S. at 226. *See also United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990).

"The following characteristics of persons giving consent are relevant when assessing the voluntariness of their consent: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and, (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system." *Chaidez*, 906 F.2d at 381 (interim citations omitted).

"In examining the environment in which consent was given, courts must also ask whether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) objected to the search or stood silently by while the search occurred." *Id*. (interim citations omitted). These factors should not to be applied mechanically, because "[t]he concept of reasonable suspicion, like probable cause, is not 'readily or even usefully, reduced to a neat set of legal rules.'" *Id*., quoting *United States v. Sokolow*, 490 U.S. 4, 7 (1989), quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

III.A.1. *Characteristics of the person consenting*

As to the relevant characteristics of Ms. Green at time of her consent to the entry of Ms. Long and the officers into her residence and the subsequent searches, the Court finds:

(1) Ms. Green was an adult as she was twenty-five years old;

(2) Ms. Green testified during the suppression hearing; she is clearly of at least average intelligence and education;

(3) Although Ms. Green submitted to a drug test on June 3, 2015, Ms. Long testified that Ms. Green did not appear to be under the influence of alcohol or drugs, and Ms. Green denied use of illicit substances; Ms. Green was not under the influence of drugs when she consented;

(4) Prior to giving consent, Ms. Green was not told she had a right not to consent nor was she advised of the *Miranda* warning; and

(5) There is no evidence that Ms. Green had any prior arrests that would have made her aware of protections afforded to suspected criminals by the legal system.

III.A.2. *The environment in which consent was given*

As far as the environment in which Ms. Green found herself when she granted consent for her home to be searched, the Court finds:

(1) Ms. Green had not been detained when she invited officers to come into her home. After a brief introduction, Ms. Green allowed the officers into her home. Shortly after explaining why the officers were present, Ms. Long asked if she could walk-through the residence to determine whether the conditions were safe for Ms. Green's child. Ms. Green willingly took Ms. Long and Deputy Wiseman through the home. The first stop was the master bedroom and the firearm was noticed immediately. The firearm was secured and then Deputy Wiseman asked for consent to search a bag that was found in the same room. Ms. Green agreed to the search without hesitation by replying "sure, go ahead." Ultimately, Ms. Green: a) agreed to allow the officer's to enter her home by inviting them in, b) she agreed that it was okay for those present to walk through the residence, and c) she agreed that it was okay for Deputy Wiseman to search the black bag. The questioning that occurred prior to the three consents was of short duration and in an effort to advise Ms. Green of the concerns related to the safety of her child.

(2) Ms. Green was not threatened, physically intimidated, or punished by the officers at any time on June 3, 2015; in fact she was treated with respect and the officers clearly expressed their intent was to insure the safety and welfare of her child.

(3) Ms. Green did not rely on any promises or misrepresentations made by the officers.

(4) At the time of each of the consents, Ms. Green was not in custody or under arrest.

(5) The location of the consent was in Ms. Green's residence which was a private place.

(6) As the search of the residence was being conducted, Ms. Green did not object to the search in any manner rather she voluntarily directed Ms. Long and Deputy Wiseman to the place where it was possible that a firearm might be found. Similarly, she did not object to an examination of the contents of the black bag. Although the officers may not have collectively recalled the exact questions that were asked to elicit consent from Ms. Green or exactly how she responded to each request, all the officers who testified confirmed that Ms. Green voluntarily acquiesced to each request.

The Court concludes that a preponderance of the evidence establishes that Ms. Green's consent regarding the officers' desire to enter the residence, look around the residence, and search the contents of the black bag was voluntary. Furthermore, based on "the totality of the circumstances the officer[s] reasonably believed that the search was consensual." *Almendares*, 397 F.3d at 660. The physical items seized should not be suppressed.

### III.D. The Defendant's Statements

The Defendant requested that this Court "suppress any and all statements made by him to law enforcement officers on the grounds that they were obtained in violation of his rights under the Fifth Amendment or were the product of [an] unlawful seizure…" (Doc. 19 at 1.) During the suppression hearing, the Defendant affirmed that the statements he wished to suppress were the statements he made to Deputy Wiseman on June 12, 2015.

Generally, statements to law enforcement officers are subject to those procedures set out in *Miranda v. Arizona*, 384 U.S. 436 (1964). Law enforcement officers must inform defendants of their rights prior to questioning. *Id*. at 444. The *Miranda* rights, however, are required only when the suspect is in custody and subjected to interrogation. *See, Stansbury v. California*, 511 U.S. 318, 321-22 (1994); *Miranda*, 384 U.S. at 478-79 (1964). The Supreme Court has held that two discrete inquiries are essential to the *Miranda* custody determination: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.B.D. v. North Carolina*, 131 S.Ct. 2394, 2402 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted). While the Court must examine all of the circumstances surrounding an interrogation, "the ultimate inquiry [is] "[was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id*. (Citations omitted). A determination whether a suspect is "in custody" focuses upon the totality of the circumstances. *Jenner v. Smith*, 982 F.2d 329, 335 (8th Cir. 1993).

In *United States v. Griffin,* 922 F.2d 1343 (8th Cir. 1990), the Eighth Circuit delineated six "common indicia of custody" to be considered when determining whether a suspect is in custody while being questioned. The indicia are:

(1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4) whether strong-arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere of the questioning was police dominated; or

(6) whether the suspect was placed under arrest at the termination of the questioning.

*Id*. at 1349. "The first three of these factors tend to mitigate against a finding of custody. The last three factors tend to weigh in favor of a finding of custody. A finding of custody does not, however, have to be supported by all six factors." *United States v. McKinney*, 88 F.3d 551, 554 (8th Cir. 1966) (interim citations omitted). A particularly strong showing on one factor may compensate for a weak showing on other factors. *See, Griffin*, 922 F.2d at 1349; *United States v. Mottl*, 946 F.2d 1366, 1370 (8th Cir. 1991) (five of the six *Griffin* factors supported finding that defendant who was questioned at the

FBI headquarters was not "in custody"); *United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011).

As to the first factor, Deputy Wiseman did not advise the Defendant that the Defendant's participation in the questioning was voluntary, that the Defendant was free to leave, or that he was not considered under arrest. Such advisements were unnecessary in light of the fact that the Defendant summoned Deputy Wiseman to speak with him. Next, the Defendant possessed unrestrained freedom of movement during the questioning. The third factor is highly relevant because the Defendant is the person who initiated the contact with authorities and sought out Deputy Wiseman by having a friend notify the authorities that the Defendant wanted to talk to Deputy Wiseman. There is no evidence that Deputy Wiseman used any strong-arm tactics or deceptive stratagems during the questioning, nor was the atmosphere police dominated. Lastly, at the conclusion of the interaction with the Defendant on the evening of June 12, Deputy Wiseman decided to make a formal arrest of the Defendant. After considering the totality of the circumstances in this case, the undersigned finds that the Defendant was not in custody on June 12, 2015 and the *Miranda* warning was not required.

Finally, "[t]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *Segura v. United States*, 468 U.S. 796, 804 (1984). "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *United*

*States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007). In this case, because Ms. Green consented to the search of her residence and the black bag, the Defendant's statements to Deputy Wiseman nine days later were not fruit of the poisonous tree. *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013).

In light of the foregoing, the Defendant's June 12, 2015 statements should not be suppressed.

### IV. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress [Doc. 29] be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of January, 2016.